UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| DANIEL MINIX, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 19-482-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| UNITED PARCEL SERVICE, INC., et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

At United Parcel Service, Inc. ("UPS"), Plaintiff Daniel Minix found "a good career" where he could "work [his] way up." [Record No. 33-8, p. 22] Unfortunately, ambition gave way to acrimony early in his tenure. Mere days after becoming a qualified package car driver, he was terminated for dishonesty when he recorded incorrect dispositions on several packages. And after admitting his fault and requesting mercy throughout the grievance process, UPS's decision to discharge Minix was upheld. His termination and its aftermath led to this lawsuit against Defendants UPS and International Brotherhood of Teamsters, Local 651 ("the Union").

Both defendants' have moved for summary judgment. [Record Nos. 32, 33] In response, Minix argues that his behavior was not dishonest and that the Union arbitrarily failed to defend him from the accusations levelled by UPS. [Record No. 42] But if the matter were submitted to a jury, Minix would face the burden of proving that UPS violated the collective-bargaining agreement when it terminated him for dishonesty *and* that the Union did not fairly represent him in the grievance process. The defendants' motions will be granted because Minix cannot meet this burden on the facts presented.

# I. FACTUAL BACKGROUND

The package car driver position was not Minix's first job with UPS. He worked as a truck unloader at UPS's Prestonsburg location the previous year. [Record No. 33-8, p. 23] While there, he rode a package car only as a passenger, when he assisted with delivering packages "a few times." [*Id.* at 24] The position was seasonal, ending in January 2018. [*Id.* at 27–28] Four months later, Minix began working as a part-time loader–unloader at UPS's Lexington North Center. [*Id.* at 28–29] He performed well in both roles by all accounts. Minix soon turned to his "original goal" at UPS: driving a package car. [*Id.* at 30]

The road to becoming a UPS package car driver begins with signing an intent form. Minix did so shortly before his twenty-first birthday in the fall of 2018. [*Id.* at 30–31] Prospective drivers then begin the qualification process. In addition to classroom training, the process involves on-road supervision and training. [Record No. 33-12, p. 9] Drivers are given a set of expectations, and supervisors review daily the performance and progress of all qualifying drivers. [*Id.* at 9–10] Supervisors ultimately decide to qualify a driver based on "[m]ultiple facets," including the time it takes to complete routes, the driver's ORION percent trace (which tracks how closely a driver is following a prepared map of deliveries), service failures, and any other record-keeping or delivery issues. [*Id.* at 21–22]

A package car driver is one of many positions at UPS. Put simply, they get packages from the UPS facility to the customer's hands. [Record No. 33-11, p. 16] Success depends on the "little brown trucks you see running around your city all over the place." [*Id.*] But success also depends on technology: the DIAD. Referred to by some as a "board," a DIAD is "the way [drivers] keep track of the packages." [Record No. 33-8, p. 198] It is a handheld device that

provides a driver his route and a list of packages to be delivered or picked up. [Record No. 33-10, pp. 26–27] And it tracks a driver's coordinates. [*Id.*]

Key functions of the DIAD include scanning packages and recording package disposition codes, which lets both UPS and the customer know what happened to the packages. [Record No. 33-12, p. 13][1] "Every package must receive a scan."[2] [*Id.*] And for each undelivered package, drivers are given a menu of options. Three are relevant here:

- *Not in 1:* When a package requires a signature or is a C.O.D. package (when payment is collected on delivery) and the customer is not at the address. [Record No. 33-11, p. 30]

- *Need Suite Number:* When a driver is unable to deliver a package because the customer is located at a particular suite or apartment within a complex and no suite number is on the package.[3] A similar package disposition is "No such number" which applies when a residential address does not exist as written on the package. [Record No. 33-12, p. 14]

- *Missed:* When no delivery attempt[4] is made. A driver may be unable to attempt delivery because of damage to the package, the package being misloaded onto the driver's car, the driver reaching the federal limit for hours worked, the driver being unable to find an address, or other reasons. Generally, drivers contact UPS about the issue before marking the package as missed. [*Id.* at 50]

---

[1]    Drivers also hand write a "service cross" on each package that is not delivered. Service crossing notes the date, the driver's initials, the reason the package was not delivered, and the time the driver was at the address. [Record No. 33-11, pp. 51–52]

[2]    Several individuals also refer to this as "sheeting" a package.

[3]    In Minix's view, this package disposition "means that [he] thought that it needed a different suite number, not that [he] couldn't find it on the package, but [he] couldn't find it in the building." [Record No. 33-8, pp. 61–62]

[4]    UPS Manager Christopher Lee testified that circling the block to find an address does not constitute a delivery attempt. In his view, "attempt means to be at the point of the address exactly." [Record No. 33-12, p. 17] UPS labor relations manager Matthew Faulstick testified that "[i]f you drove around the block and you couldn't find it, it would have been missed or no such number." [Record No. 33-10, p. 35]

- 3 -

In general, drivers scan packages and enter package dispositions at the location of attempt. This allows drivers to leave a paper "info notice" with the customer indicating that delivery was attempted, but unsuccessful. [Record No. 33-10, p. 33]

The parties do not dispute the policies and procedures described above, but Minix claims he was unaware of most of them prior to his termination. In particular, he testified that he did not know: (1) when to use each disposition code [Record No. 33-13, p. 11]; (2) what the "missed" package disposition means [Record No. 33-8, p. 45]; (2) what the "need suite number" package disposition means [*Id.* at 61–62]; and (3) that a package disposition must be scanned at the attempt location [Record No. 33-13, p. 12].[5] There is no evidence that a training manual or any other document listing package dispositions or other policies is given to drivers. [Record Nos. 33-11, p. 32; 33-12, pp. 18–19]

Absent written policies, UPS management set expectations based on "UPS methods which all of [their] drivers are trained on." [Record No. 33-10, p. 47] And both UPS management and Union members (who work for or used to work for UPS) testified that future drivers learn the policies and procedures above during their training and at a class known as Integrad. [Record Nos. 33-11, p. 32; 33-12, p. 19] Union President Michael Watson described this course as a "boot camp of becoming a delivery driver." [Record No. 33-11, p. 32]

Minix testified that he did not attend Integrad. [Record No. 33-13, pp. 8–9] However, he later clarified that he attended a weeklong course, but that "all [he] did was [sit] in a

---

[5]     Faulstick testified that Minix was trained to record package disposition codes at the address. [33-10, p. 32]

classroom in Cincinnati." [Record No. 33-8, pp. 31–32]  Between his coursework and on-the-job training, Minix claims that he was not taught to properly scan and report packages:

> They didn't train me on most of the different situations on how to scan these packages . . . . no one had told me about different situations on how to scan some of these packages.  And there was ways that I had done it on my training route that had been working and no one had said anything to me.

[*Id.* at 33]

Minix's Employee History Profile, which includes a record of training, indicates that he completed over twenty courses on September 28, 2018, but it does not provide details beyond the names of the courses.[6]  [Record No. 33-9]  Altogether, there is little in the record to confirm the amount of instructional training Minix received before qualifying as a driver.

A clearer picture of Minix's actual driving experience can be found.  As noted above, in his first two roles, Minix did not drive a package car.  That changed when the qualification process began.  He was trained on a single route that was "all the same every day," so he did not "learn the variations of different routes."  [Record No. 33-8, p. 41]  Ninety percent of the stops on this route were at business, rather than residences.  [Record No. 43-1, p. 2]  And Minix claims he knew some package disposition codes, but only as they applied to the stops on his training route.  [*Id.* at 14–15] He acknowledged, however, that the method of entering a package disposition code does not change with each route.  [Record No. 33-8, pp. 44–45]

Minix's pre-qualification record bears one significant blemish occurring in late 2018.  At the end of his shift, He brought back thirty-six packages.  [*Id.* at 35]  None had a recorded disposition, and he did not inform UPS of any delivery issue.  [*Id.* at 36–37] The incident

---

[6]     Of note here, one completed course was named "DIAD IV Training."  [Record No. 33-9]

resulted in his qualification process being frozen until March 2019. [*Id.* at 38] Watson, Minix's lead business agent, claims that UPS considered disqualifying Minix, but that he negotiated for a second chance at qualification on his behalf.[7] [Record No. 33-11, pp. 10–12] Ultimately, the incident did not result in any additional discipline or training. [Record No. 33-8, p. 35]

Minix was successful in his second attempt at qualification. Apart from a minor incident (that is, his UPS manager Christopher Lee claims a single package was improperly handled during one of Minix's routes [Record No. 33-12, pp. 10–11]), Minix continued to successfully complete his training route. By the end of his training, he had driven the training route thirty-seven times,[8] averaging around ninety-two delivery stops and thirty-six pickup stops per day. [Record No. 33-8, pp. 36–37] Minix became a qualified package car driver on May 30, 2019. [*Id.* at 35]

But any comfort in his new position was short-lived, as two or three days into his qualification, Minix—in his own words—"had a really bad day." [Record No. 33-13, p. 5] That Saturday, June 8, UPS supervisor Matt Ward assigned Minix to route 93T. The route required stops at multiple apartment complexes and business on Lexington's south side and

---

[7]    Minix testified that he was not aware of Watson's involvement but had no reason to dispute his account. [Record No. 33-8, pp. 185–86] Watson claims that Minix was present when the negotiation occurred. [Record No. 33-11, p. 10]

[8]    The record does not indicate how many times Minix completed the training route in 2018, when he began the qualification process. However, there is no dispute that the only route Minix completed by himself was the training route. He completed one other route one time with a supervisor. [Record No. 33-13, p. 8]

was new to Minix.  [Record Nos. 33-8, p. 5; 33-13, 13] He was tasked with delivering 186 packages at 145 stops.  [Record No. 32-2, p. 37]

Trouble began that morning.  Faced with a keypad-guarded gate at a retirement community, Minix coded the package as "Not in 1" and kept moving.  [Record No. 33-8, pp. 74–76] Next, inside a mixed-use development with stops at residential apartments and retail establishments, Minix did not reach several addresses.  [Record No. 33-13, p. 12] Unable to find the addresses, Minix scanned the packages with the "Not in 1" or "Needs Suite Number" disposition codes, even when business were open and suite numbers were visible on the packages.  [*Id.* at 11] Similar problems occurred at several other addresses.  [Record No. 32-2, p. 41 (chart reproduced at Record No. 32-1, p. 5)]

Twice, Minix reached out to Ward by phone for assistance.  He told Ward he was "struggling," but did not inform him that he could not find certain locations.  [Record No. 33-8, pp. 93–94] Ward eventually relieved Minix of his assigned pickups.  [*Id.* at 51] According to Minix, this was "helpful," but "did not address the delivery problems [he] was having locating apartment or businesses." [Record No. 43-1, p. 2] The two continued to communicate *via* text message that day, and Minix eventually informed Ward he had only a few remaining delivery stops.  [Record No. 32-10, p. 2]

Minix returned to UPS and clocked out at 6:39 p.m.  [Record No. 33-8, p. 56] He parked his package car in the same spot he retrieved it that morning, as he had done while training.  [*Id.* at 84–85]  Several packages were left on the package car, while packages in need of a new suite number were brought inside.  [*Id.* at 84]  And because he labeled several packages as

"Not Found" in his DIAD, he was not alerted to the fact that they had not been scanned.[9]  [*Id.* at 77-78]  During a package car audit conducted that evening, UPS supervisor Joseph Dean discovered the undelivered packages.   [Record No. 33-12, p. 23] He contacted Lee immediately.  [*Id.* at 22] That weekend, Dean investigated each undelivered package and prepared a report.  [*Id.* at 24]

The following Monday morning, Dean emailed what he found to Lee and Dustin Phillips, Minix's supervisor.  [Record No. 32-2, p. 66] In addition to reminding the supervisors of Minix's similar incident in 2018, he included a spreadsheet listing the specific issues with each package and several photographs.   The chart listed twenty-two problem packages.  [Record No. 32-2, p. 41] The parties do not dispute[10] the results of the investigation:

- Several packages were given a package disposition code of "Need Suite Number," but the apartment or suite number was visible on the package.

- Several packages were given a package disposition code of "Not in 1," but Minix never actually attempted delivery, and no info notice was left.  Dean confirmed that two commercial establishments whose packages were given this code were open until 9 p.m.

- Eight packages were scanned at a different location than the delivery address.  One was scanned five miles from the delivery address.

- Five packages (destined for various locations) were not scanned at all.

[*Id.*]  Minix acknowledges that the package disposition codes were incorrect, but he does not consider them to be falsified.  [Record No. 33-8, p. 59] "[A] falsification is trying to deceive,"

---

[9]     Minix testified at his state panel hearing that he did not know why the packages with no scan did not appear on his DIAD when he clocked out.  [Record No. 33-13, p. 10]

[10]     Minix does complain that the spreadsheet omits the time and sequence of each delivery and fails to account for the deliveries he successfully made that day.  [Record No. 42, p. 10]

he said.  "I was not trying to deceive anybody."  [*Id.* at 60]  UPS disagreed.  After he received

Dean's email, Lee sent a short email to his superiors: "Gross insubordination/dishonesty.  Will

be terminated tomorrow will ask you to join."  [Record No. 42-4, p. 5]

Minix was covered under the Collective Bargaining Agreement ("CBA") between UPS

and the International Brotherhood of Teamsters and its Central Region Supplement.  [Record

Nos. 33-7, p. 10; 33-6, p. 5] Article 17 of the supplemental agreement specified that an

employee could not be discharged or suspended "without just cause."  [Record No. 33-6, p.

54] Both a "warning letter of a complaint" and a "local level hearing" were also required before

discharge or suspension.  [*Id.*]  But an employee accused of "dishonesty" is not entitled to

these pre-termination procedures.  [*Id.*]

Terminations for dishonesty follow a different path.   With few pre-termination

protections, employees must reserve their arguments for the post-termination grievance

process.  A grievance is first addressed at a local panel hearing.  [Record Nos. 33-6, p. 26; 33-

11, pp. 22–23] If local decisionmakers are deadlocked, a state-level panel will hear the case.

[Record No. 33-6, p. 26] Witness refer to this stage as the state panel hearing.  At any stage,

when a decision is reached, it is "final and binding on both parties."  [*Id.* at p. 25]  Every step

of the way, the Union acts as the employee's business representative.  [Record No. 33-11, pp.

8–9]

The process of termination and grievance began with Dean's email, described above.

Soon afterwards, Lee spoke with UPS labor relations manager Matthew Faulstick about the

incident and forwarded the results of Dean's investigation to him.  [Record No. 33-10, p. 4]

Faulstick approved the discharge for dishonesty.  He concluded that Minix was dishonest

because the packages lacked "proper dispositions" and Minix "misrepresent[ed] information." [*Id.*]

Lee met with Minix on June 11, 2019.[11]  [Record No. 33-8, p. 87]  Confronted about the inaccurate package disposition codes, Minix "tried to explain why [he] did what [he] did on some of these places, which [he] still didn't know where a lot of these places was at, so [he] did the best [he] could explaining why."  [*Id.* at 88] He agreed with Lee that the package dispositions were incorrect.  [*Id.*]  Minix left that meeting suspended from work, pending an investigation.  [*Id.* at 89] Two days later (June 13, 2019), he received formal written notification of his termination in a letter from Lee.  [See Record No. 33-8, 89; *see also* Record No. 33-2 (termination letter, dated June 12, 2019).]

Minix claims that he "hadn't talked to Mike Watson at all before the local [panel hearing]."  [Record No. 33-8, p. 142] But he later admits that Watson helped prepare his grievance and discussed "the basic details" of the matter with him.  [*Id.* at 142–43]  He reports that the conversation lasted about fifteen minutes.  [*Id.* at 148] "[Watson] told [him] when to show up before the local panel, and other than that, [he] didn't know any details, any of the stuff they had on [him], anything like that."  [*Id.* at 143]

Watson's recollection differs slightly.  Prior to the local panel hearing, he recalls discussing the matter "very little actually, just to find out exactly what [Minix's] take was on it . . . ."  [Record No. 33-11, p. 21] The fifteen-minute discussion took place right before a grievance was filed.  [*Id.* at 21–22] He also recalls a meeting with Lee and Minix at which Lee

---

[11]     Minix did not mention the attendees of this meeting, other than Lee.  Lee remembers himself, Minix, Robin Yates (a member of UPS's security team), and one or two union stewards being in attendance.  [Record No. 33-12, p. 29]

"decided he was going to terminate Daniel." [*Id.* at 17] Lee discussed the packages with incorrect dispositions and the similar 2018 incident before terminating Minix for dishonesty. [*Id.*] Neither Watson nor Minix disputed Lee's allegations at this meeting. [*Id.* at 18–19]

Minix filed his grievance on June 13, 2019. [Record No. 33-3] Both Watson and John Abby, a union steward, signed. [*Id.*] Watson would take the lead in acting as Minix's business representative. [Record No. 33-11, pp. 8–9] His involvement exposed some internal tensions within the Union. In his words: "It was politics—union politics is all it was."[12] [*Id.* at 62] Minix's father—Morse "Mo" Minix—was a former vice president of the Union and a close ally of the outgoing Union president (recently defeated by Watson in a contested election). [Record Nos. 33-8, p. 10; 33-11, p. 62] Both Watson and Mason Middendorf, a UPS employee and part-time Union agent in a different department, testified that Minix's case carried political importance. [Record Nos. 33-11, pp. 64–65; 33-5, p. 21] They thought that any finding against the Union would further sour relationships within the Union. [Record No. 33-11, pp. 64–65]

Watson confirmed that he did not speak with Minix before the local panel hearing. [*Id.* at 27] He also did not request documents or other evidence from UPS. [*Id.*] Instead, he focused on resolving the grievance behind the scenes. [*Id.*] Watson claims he contacted multiple UPS decisionmakers, attempting to convince them to reduce Minix's punishment. Watson added that this tactic is "pretty typical of how [he] operate[s]." [*Id.* at 25] Of his conversation with

---

[12]   The undersigned is aware that "union politics" can be contentious, even occasionally leading to federal lawsuits. *See Int'l Bhd. Of Teamsters Local 651 v. Philbeck*, 464 F. Supp. 3d 863 (E.D. Ky. 2020). Minix himself felt that "because of [his] dad's presence in the union, [he felt] like there was enemies made on both sides [*i.e.*, the Union and UPS]." [Record No. 33-8, p. 117] But in general, he focuses on this history far less than the Union. Accordingly, the Court looks to it only to the extent that it sheds light on how Watson approached his representation of Minix.

Lee, he recalls that Lee was "upset" and "not happy" about the incident.  [*Id.* at 24]  Lee "assume[s] that he would have called" him, but does not recall a specific conversation with Watson.  [Record No. 33-12, p. 40]

Watson also spoke to Faulstick about a lighter punishment for Minix, saying he often works with UPS's labor department to resolve grievances outside of hearings.  [Record No. 33-11, p. 28] Faulstick confirms that Watson approached him multiple times.  [Record No. 33-10, pp. 18–20]  He describes his general response to Watson's overtures about Minix:  "[He] believe[d] his actions absolutely warrant discharge based off the [CBA] and [Minix's] inability to explain what transpired and lack of remorse did not warrant a lesser penalty than discharge." [*Id.* at 19]  But Watson claims that he came away from these conversations and others thinking that "we were going to maybe work this thing out, but that UPS was upset with the man.  There was no doubt.  It was an incident that they weren't really pleased with."  [Record No. 33-11, p. 27]

Both Minix and Watson were not aware of the full extent of UPS's cases until the local hearing, held June 19, 2019.  [Record No. 33-8, p. 191] There, Faulstick appeared *via* telephone and presented UPS's case against Minix.[13]   [Record Nos. 33-8, pp. 97–98; 33-11, p. 29] Watson then offered a brief rebuttal, arguing that Minix was confused, but not dishonest. [Record No. 33-11, p. 29]  Brandon Grow, the newly elected Union steward, recalls offering to mentor Minix if he was reinstated, but being rebuffed by Faulstick.  [Record No. 42-3, p. 4]

---

[13]     Other Union and UPS officials were also in attendance.

Watson received the documents used as evidence by UPS from Faulstick after the local hearing.  [Record No. 33-10, p. 16]

Deadlocked at the local level, Minix's grievance next came before the state panel.  Led by Watson, the Union's team also included Middendorf and Joe Bill Lance, another agent.[14] [Record Nos. 33-11, p. 9; 33-5, p. 10]  The team met with Minix and told him that a "mercy case" would be "the best way to go . . ."  [Record No. 33-5, p. 15] The idea behind a mercy case is simple: the grievant admits to the wrongdoing uncovered by UPS, but apologizes, explains his actions, and seeks reinstatement.  [*Id.* at 14–15]  Middendorf explained that employees "can't go in and argue away half of the evidence and the other half still be there and ask got mercy on the other half. . . .  It's either a mercy case or it isn't and you have to approach the case in that—in that fashion."  [*Id.*]  When told it would be a mercy case, Watson remembers Minix immediately agreeing with the strategy.  [Record No. 33-11, pp. 46, 53]

Witnesses disagree about the extent to which the Union and Minix prepared for his state panel hearing.  Minix remembers a twenty-minute discussion: "Basically, they just told me I had to go in and apologize and that they just kind of showed me some different stuff that they

---

[14]     Minix wanted Grow to attend his state panel hearing and assist with the grievance.  Watson acknowledges overreacting to Minix's request for Grow to attend:  "I got a little upset with [Grow] because of his—there was an indication that he wanted to take over the hearing or take of the case . . . .  That was my—my assumption and it was a false assumption."  [Record No. 33-11, p. 41]  But even Grow admits he would have added little to the discussion.  [42-3, 6 ("I—at that point in time—well, I've never been to a state panel, like, actually on the inside, so I wouldn't—I wouldn't have known what to say to them to be perfectly honest.").]  Watson stated that Grow did not attend the state panel hearing because Lee and UPS "could not spare him."  [Record No. 33-11, p. 44]

had as far as the paperwork and where I was scanning stuff."[15]  [Record No. 33-8, p. 145]  But Middendorf recalls a two-hour meeting in which "a pretty damning case" was reviewed. [Record No. 33-5, p. 12] Watson states that Minix was drilled on the details of the delivery route and possible questions the panel would ask.  [Record No. 33-11, p. 53]

Prepared or not, Minix appeared before the state panel on June 25, 2019.  A state panel is made up of Union representatives and UPS representatives.  [Record No. 33-8, p. 99] Each side meets with their representatives prior to the hearing.  Watson and Middendorf reminded the Union panelists that "it was a politically sensitive case" and that they "needed all the help [they] could get in getting this young man his job back."  [Record No. 33-5, p. 21] And Faulstick recalls reviewing the facts of Minix's case and UPS's position with UPS representatives prior to the hearing.  [Record No. 33-10, pp. 20–22]

The hearing opened with Faulstick's presentation of evidence to the panel.  [Record No. 33-13, p. 1]  He began with Dean's email to Lee describing the undelivered packages and proceeded to work through each package with an incorrect disposition or other service issue. [*Id.* at 1–4]  The floor was then given to Watson and Minix.

Minix was not satisfied with what he called Watson's "one-minute speech."  [Record No. 33-8, p. 200] In his view, Watson merely asked for Minix to be reinstated, rather than making "arguments of why I should have it back . . . . he wasn't supplying information to say [Minix] deserve[d] [his] job back."  [*Id.* at 201] Watson and Minix's full statements to the state panel are in the record.  Watson began:

---

[15]      Minix later clarified that he was shown all of UPS's evidence, given time to explain himself to the Union, and told what would happen at the panel.  [Record No. 33-8, p. 193]  But he stuck to his recollection that the meeting lasted "20 to 30 minutes."  [*Id.* at 194]

Members of the panel, you have the case—you have before you a young, 21-year old package car driver . . . .  He sits here terminated under Article 17 subpart A—Dishonesty.  Panel, nothing could be further from the truth.  He wasn't dishonest.  He was completely overwhelmed.  He found himself in a position that every rookie driver has been in—yours truly included.  Daniel was well aware of what it takes to be a driver from UPS, and was given a second chance to qualify in the new year, and he did just that.  He proved he could do the job, but on this Saturday, which was his first Saturday to work, working, he failed to do the job he was hired for.  He failed to service the customers of UPS; he let himself down as well.  But, it was not on purpose.  It was not malicious, and it was not dishonest.  It was a total meltdown on his part—that's all this was—a terrible day on a package car for which he is truly sorry.

Daniel did call for help to the center and was informed, informed them of his situation.  Panel, you have an opportunity to help this young man prove to UPS he can do the job.  I have discussed with several drivers at the Center of Lexington North that want to help this young man succeed.  At this point, I'm going to turn it over to Daniel to kind of explain what happened that day, and I'll have him tell you how he's going to make this right.  Daniel?

[Record No. 33-13, pp. 4–5]  Minix's statement was brief:

I just want to say that I know I messed up.  I had a really bad day that day, and nothing that I did I was trying to be dishonest or hurt the Company at all.  I was just overwhelmed and kinda panicked a little bit on a lot of different situations, and it caused me to make bad decisions and do things not the right way.

[*Id.* at 5] Watson then concluded that the state panel should afford Minix a second chance to drive a package car.  [*Id.*]

On behalf of UPS, Faulstick took issue with several of Minix's arguments.  UPS considered the act dishonest because the "packages were recorded with inaccurate disposition[s]."  [*Id.*]  And Faulstick argued that the act "absolutely is malicious.  When you record these with inaccurate dispositions, and you do it 22 times, that is malicious."  [*Id.*]  He also took issue with Minix's failure to communicate the specific issues he was encountering throughout the day.  [*Id.* at 5–6]

- 15 -

Minix next faced questions from panel members.  Asked by a Union panelists what he would do differently, he offered a few suggestions: he would "slow down a little bit," "make sure every package was accounted for," and "communicate better."  [*Id.* at 8] When question about why he made the choices he did during his delivery route, Minix did not know the answer to multiple questions.   But when asked several leading questions about his package dispositions, Minix admitted to his actions:

> [Q.]:   [Y]ou put a disposition on these packages that wasn't accurate, correct?
> [A.]:   Yes.
>
> [. . . .]
>
> [Q.]:   [Y]ou do acknowledge that you falsified these delivery records?
>          Correct?
> [A.]:   Uh-huh.
>
> [. . . .]
>
> [Q.]:   So, you falsified that delivery.  Correct?
> [A.]:   Yes.
>
> [. . . .]
>
> [Q.]:   So instead of sheeting them as missed, you put a false disposition on
>          them.
> [A.]:   Right.

[11–13]  Minix says these answers were truthful.  [Record No. 33-8, p. 100]  But he believes he answered this way because he was unprepared for the questions.  He states: "I wasn't fully aware of what I was agreeing to at that point. . . .  I wasn't fully aware of what falsifying was at that time. . . .  I just thought that it was incorrect.  I thought it meant the same thing."  [*Id.* at 201]

- 16 -

Minix indicated on the record during the hearing that the Union properly represented him.  [Record No. 33-13, p. 15] And he left feeling positive about his case.  [Record No. 33-5, p. 23] Middendorf, however, was less optimistic: "I thought it was pretty brutal actually. The questioning that he was given, I thought it was pretty brutal, but he told me that he thought it went well."  [*Id.*]  Unfortunately for Minix, Middendorf's assessment proved accurate. Watson and other Union officials learned that the grievance was denied later that day, and Watson called Minix to inform him of the decision.  [Record No. 33-11, p. 71]  The official decision was handed down within days.  [Record No. 33-4]

At least one Union representative on the panel voted to deny the grievance.  [Record no. 33-8, p. 59]  In a discussion after the hearing, both Watson and Middendorf heard that the Union panelists "didn't think Minix was forthcoming in his testimony and that basically they had a hard time believing . . . what he said about the disposition of the packages."  [Record No. 33-5, p. 25; *see also* Record No. 33-11, p. 70 (recalling that a Union panelist "basically felt that he was lying to the panel").]  Despite the defeat, Watson says he continued to speak to other Union officials after the grievance was denied, searching for a way to have Minix rehired.  [Record Nos. 33-5, p. 27; 33-11, pp. 73–74]  His efforts were unsuccessful.  [Record No. 33-11, pp. 73–74]

Minix's positive opinion of the Union's representation "changed after [he] didn't get [his] job back."  [Record No. 33-8, p. 204]  He, his father, and a friend confronted Watson and Middendorf the Sunday after the state panel hearing.[16]  [*Id.* at 11–13]  Morse Minix questioned

---

[16]     Minix recorded the conversation, and his counsel produced a transcript of it.  [Record No. 42-2, p. 2]

Watson on what rebuttal evidence he had gathered and asked "why Mike Watson said that the case was a mercy case from day one."  [*Id.* at 13]    A key theme of the conversation was Minix's frustration with the evidence Watson chose not to gather.  [Record No. 42-2, pp. 9–23] Middendorf claims the choice was calculated because "even if we could argue some [evidence] away, we couldn't argue [other evidence] away and we're still back to him being terminated." [Record No. 33-5, p. 16] And asked later what he would have done differently at the state panel, Minix said he was "drawing a blank."  [Record No. 33-8, p. 202]

The fallout over his termination and the denial of his grievance caused two legal proceedings.  First, he filed charges with the National Labor Relations Board ("NLRB"), with the assistance of past Union president Mike Philbeck, feeling his "termination was unjust." [Record No. 33-8, p. 109] The NLRB declined to issue a complaint.  [Record No. 33-16]

Second, he filed the *pro se* Complaint in this action.[17]   He alleges that he "was terminated without just cause under the labor agreement." [Record No. 1, p. 4]  Minix further alleges that the Union "failed to properly investigate and obtain important evidence that would have shown [he] was not dishonest" and "violated its duty of fair representation."  [*Id.*]  As relief, Minix seeks reinstatement, full back pay and benefits, and "all other relief and damages allowed by law."  [*Id.*]

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *FTC v. E.M.A. Nationwide,*

---

[17]        Minix has since retained counsel.

*Inc.*, 767 F.3d 611, 629 (6th Cir. 2014).  Disputes over issues of material fact are genuine if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Thus, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251–52; *see also Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

The parties moving for summary judgment bear the burden of demonstrating that no genuine issue of material fact exists.  *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002) (citing *Celotex Corp.*, 477 U.S. at 323).  If they meet this burden, the nonmoving party must present sufficient evidence from which a jury could find for him.  *Harrison*, 539 F.3d at 516 (citing *Anderson*, 477 U.S. at 252).  The nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  When reviewing summary judgment motions, the Court views all facts and inferences drawn from the evidence "in the light most favorable to the nonmoving party."  *Black v. Pension Ben. Guar. Corp.*, 983 F.3d 858, 862 (6th Cir. 2020) (citing *Morehouse v. Steak N Shake*, 938 F.3d 814, 818 (6th Cir. 2019)).

### III.  LEGAL ANALYSIS

Section 301 of the Labor Management Relations Act ("LMRA") allows for "[s]uits for violation of contracts between an employer and a labor organization" to be brought in federal court.  29 U.S.C. § 185(a).  But Congress also codified a preference for employees to resolve CBA-related disputes in the "contractual remedial procedures" set forth in the CBA.  *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562–63 (1976); *see also Hayes v. UPS*, 327 F.

App'x 579, 583–84 (6th Cir. 2009).  Thus, employees must seek relief in the grievance process, where a union represents its member-employees against the employer.  *Id.*

In this context, the Supreme Court has interpreted the LMRA to impose a "responsibility and duty of fair representation" on unions.  *Hines*, 424 U.S. at 564 (quoting *Humphrey v. Moore*, 375 U.S. 335, 342 (1964)).  And when an employee can demonstrate that a union has breached its duty of fair representation, he may bring his claims in federal court. *Vaca v. Sipes*, 386 U.S. 171, 186 (1967).  Known as hybrid § 301 claims, these employee actions are two "inextricably interdependent" claims in one.  *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003) (quoting *DelCostello v. Teamsters*, 462 U.S. 151, 164 (1983)).  Employees must prove: (1) "breach of a collective bargaining agreement by the employer" and (2) "breach of the duty of fair representation by the union."  *Id.* (quoting *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 583 (6th Cir. 1994)).  Failure to demonstrate either violation will defeat an employee's claim.  *Id.* (citing *Bagsby v. Lewis Bros. Inc. of Tenn.*, 820 F.2d 799, 801 (6th Cir. 1987)).

**A.  UPS did not breach the terms of the CBA.**

The parties do not dispute that Article 17 of the supplemental agreement allows UPS to immediately discharge an employee for dishonesty.  [Record No. 33-6, p. 54]  Minix argues that UPS violated that agreement when it terminated him because he was not actually dishonest.  [Record No. 1, p. 3] Specifically, he argues that dishonesty necessarily requires "intent to deceive," which he lacked when placing incorrect disposition scans on packages. [Record No. 42, pp. 12–21]

"The construction of collective bargaining agreements . . . is a question of law." *Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 317–18 (6th Cir. 1984) (citations omitted).   And courts interpret CBAs "according to ordinary principles of contract law," meaning that when "the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained with its plainly expressed intent."  *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (citations omitted).   The word "dishonesty" here is clear and unambiguous.

First, the parties do not dispute that dishonesty generally requires intent to deceive. This comports with standard definitions of the word.  *Webster's Third New International Dictionary Unabridged* 650 (1993) ("lack of honesty, probity, or integrity in principle; lack of fairness or straightforwardness; disposition to defraud, deceive, or betray); *see also Garner's Dictionary of Legal Usage* 284 (2011) ("*Dishonest* is broad, implying perhaps an instance or the habit of skewing the truth <a dishonest assertion>, but it may also imply an instance or the habit of stealing or cheating <a dishonest merchant>.").   And the only case defining "dishonesty" in a similar CBA provision, an unpublished Sixth Circuit opinion, held that "[d]ishonesty includes a component of intent to deceive."  *Linton v. United Parcel Serv.*, 1991 U.S. App. LEXIS 11494, at *7 (6th Cir. May 24, 1991).

A jury here would not have to define dishonesty; rather, it would be tasked with determining whether UPS improperly discharged Minix for dishonesty.   Minix argues that doing so requires UPS to prove in this proceeding that he had the intent to deceive.   But the undersigned is not persuaded that "a post-hoc examination of the facts underlying [UPS]'s decision to terminate him" is appropriate.  *Blesedell v. Chillicothe Tel. Co.*, 2015 U.S. Dist.

- 21 -

LEXIS 57418, at *39 (S.D. Ohio May 1, 2015). Instead, as other courts in the Sixth Circuit have held, the "honest belief" standard applies in hybrid § 301 actions when evaluating a termination decision. *See, e.g.*, *Baker v. Lear Corp.*, 2016 U.S. Dist. LEXIS 114563, at *17–18 (E.D. Mich. Aug. 26, 2016); *Blesedell*, 2015 U.S. Dist. LEXIS 57418, at *39–41; *Deats v. IUE-CWA*, 2013 U.S. Dist. LEXIS 57191, at *9–11 (W.D. Ky. April 22, 2013).

The "honest belief" rule requires an employer to have "an honest belief in its reason for discharging an employee where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made.'" *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806–07 (6th Cir. 1998)). The employer's "decisional process" need not be "optimal" or leave "no stone unturned." *Smith*, 155 F.3d at 807. The Court only asks "whether the employer made a reasonably informed and considered decision before taking an adverse action." *Id.*

UPS has shown that its decision to terminate Minix was reasonably informed and considered. To start, it is undisputed that Minix placed incorrect dispositions on several packages. [Record No. 33-8, p. 59] The parties debate whether to call those dispositions incorrect or false, but it is a distinction without a difference in this context. [*Id.* at 60] What mattered to UPS was whether Minix had made an attempted delivery and whether the customer was given notice of that attempted delivery. [Record Nos. 33-10, p. 33; 33-12, p. 13] By placing both "Needs Suite Number" and "Not in 1" on packages, he was stating to UPS and the customer that he attempted a delivery, which he admits he did not do. [Record Nos. 33-11, p. 30; 33-12, p. 14]

When the undelivered packages were discovered, UPS undertook a reasonable investigation of what went wrong.  Dean created a detailed spreadsheet with addresses, package dispositions, and scan locations.  [Record No. 33-12, p. 24] He also gathered photographs of the undelivered packages and explained his suspicion that Minix improperly parked his vehicle in the wrong place and placed several packages in the wrong place. [Record No. 33-2, p. 66] While Minix refutes Dean's suspicions regarding the car and package locations, he does not take issue with his investigation into the undelivered packages. [Record No. 33-8, p. 59]

With this investigatory material in hand, Lee met with Minix and gave him the opportunity to explain his actions.  There, Minix "did the best [he] could explaining why" the package dispositions were incorrect.  [*Id.* at 88] Following this meeting, Lee decided to terminate Minix in light of this incident and his prior, similar incident. [Record No. 33-11, p. 17] Faulstick, who approved the discharge, focused on "his inability to explain what transpired" in justifying a discharge. [Record No. 33-10, p. 19] There is no evidence that UPS was not honest in its belief that Minix did not adequately explain his actions.

Minix cannot rely on his alleged lack of knowledge of the package disposition codes to survive summary judgment.  First, he admitted that package disposition codes and DIAD operation does not vary from route-to-route. [Record No. 33-8, pp. 44–45] But even if he was completely unaware of the details of his job, the decisionmakers at UPS (who trained him and approved his qualification) were under the impression that he was aware of how to handle undelivered packages. [Record No. 33-10, p. 47; 33-12, pp. 9–10, 21–22] Minix claims he explained this reasoning at the time of termination, but UPS did not find him forthcoming.

[Record No. 33-8, p. 87] For all these reasons, UPS had an honest belief that Minix was dishonest, and, as a matter of law, it did not breach the CBA when it terminated him.

### B. The Union did not breach its duty of fair representation to Minix.

Even assuming a genuine dispute of material fact exists as to the first element of Minix's hybrid § 301 claim, he still must demonstrate that the Union's "actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith." *Garrison*, 334 F.3d at 538. In addition to that showing, he also faces "the onerous burden of proving that the grievance process was '*seriously flawed* by the union's breach of its duty to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct.'" *Black*, 15 F.3d at 585 (citing *Hines*, 424 U.S. at 570). The Union's failures must have "tainted the grievance procedure" so that "the outcome was more than likely affected by the Union's breach." *Garrison*, 334 F.3d at 539 (quoting *Dushaw v. Roadway Express, Inc.*, 66 F.3d 129, 132 (6th Cir. 1995)). Here, Minix argues only that the Union's conduct toward him was arbitrary and perfunctory.

"A union's action is arbitrary only if such conduct can be fairly characterized as so far outside a wide range of reasonableness that it is wholly irrational or arbitrary." *Courie v. Alcoa Wheel & Prods.*, 577 F.3d 625, 631 (6th Cir. 2009) (quoting *Air Line Pilots v. O'Neill*, 499 U.S. 65, 67 (1991)) (cleaned up). This standard is "described in terms of 'extreme arbitrariness.'" *Garrison*, 334 F.3d at 539 (quoting *Black*, 15 F.3d at 585). "Mere negligence on the part of a union does not satisfy this requirement." *Id.* at 538 (citing *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372–73 (1990)). Neither do "ordinary mistakes, errors, or flaws in judgment." *Id.* (citing *Walk v. P*I*E* Nationwide, Inc.*, 958 F.2d 1323, 1326 (6th

Cir. 1992)).  And union agents are not held to the same standard as lawyers.  *See id.* at 539;
*Poole v. Budd Co.*, 706 F.2d 181, 185 (6th Cir. 1983).  Accordingly, the Court's examination
of the Union's actions "must be highly deferential . . . ."  *Mains v. LTV Steel Co.*, 89 F. App'x
911, 918 (6th Cir. 2003) (quoting *O'Neill*, 499 U.S. at 78).

Minix asserts five alleged shortcomings in the Union's representation: (1) Watson
accepted UPS's version of events; (2) Watson did not adequately investigate the incident by
failing to interview additional individuals and seek records of Minix's whereabouts; (3)
Watson did not accept help from Grow; (4) Minix was not fully prepared for the state panel
hearing; and (5) Watson's presentation at the state panel was insufficient.  [Record No. 42, pp.
23–31] These allegations fail to rise to the level of extreme arbitrariness required by law.

Multiple concerns raised by Minix focus on the Union's investigation of his
communications with Ward and the decision not to gather additional documentary evidence.
The failure to present favorable evidence "may constitute a breach of its duty only if that
evidence probably would have brought about a different decision."  *Black*, 15 F.3d at 585
(citing *Taylor v. Ford Motor Co.*, 866 F.2d 895, 898–99 (6th Cir. 1989)).  In *Black*, the
testimony that the union failed to present involved a "vital matter."  *Id.*  Here, the evidence
does not rise to this level.

Minix's arguments regarding the conversations with Ward are misplaced for two
reasons.  First, Watson did introduce evidence of Minix's phone calls and text messages
exchanged with Ward seeking assistance.  [Record No. 33-13, p. 6]  Second, although Minix
claims that "far more needed to be said," he does not make clear what value this evidence had.
Minix only let Ward know he was "struggling," but failed to inform him of specific problems.

[Record No. 33-8, pp. 93–94] This evidence would do little to refute UPS's assertion that Minix never told his supervisors about his delivery issues or confusion.

The other evidence Minix argues should have been gathered and presented are GPS records of his whereabouts that day.  The only dispute that could be resolved by this evidence is whether Minix was ever at the addresses in question.  Minix contends that GPS records could show that Minix was at or near the addresses.  But whether Minix was near the addresses was not central to UPS's case.  Rather, UPS focused on whether Minix attempted delivery and left notice with the customer.  [Record Nos. 33-10, p. 35; 33-12, p. 17] Minix does not dispute that he never attempted delivery at the addresses in question.  On this point, no additional evidence could save his case.

Given the limited value of the evidence not gathered by the Union, the strategic decisions made by Watson come into focus.  The parties do not disagree that Watson chose a strategy, broadly referred to as a "mercy case."  A mercy case is not always designed to accept the ultimate conclusion of the employer.  Rather, it takes the position that when an employer has a strong case, any argument for innocence or leniency is undermined by disputing inconsequential parts of the evidence.  [Record No. 33-5, pp. 14–15]  For instance, even if the panel had GPS records showing that Minix was parked at an address, the Union concluded that he would still be terminated for failing to attempt delivery at that address and scanning a false disposition.  [*Id.* at 16]

Further, Minix equates a mercy case with acceptance of UPS's arguments.  This fails to acknowledge that Watson's main argument at the state panel hearing was that Minix was overwhelmed, not dishonest.  [Record No. 33-13, pp. 4–5 ("Panel, nothing could be further

from the truth.  He wasn't dishonest.").  He then gave Minix the opportunity to explain why his mistakes were innocent, rather than dishonest.  [*Id.*]  Minix's grievance was denied not because Watson failed to speak at length on the evidence, but because a majority of panelists felt that Minix was not forthcoming in his explanation of the incident.  [Record Nos. 33-5, p. 25; 33-11, p. 70]

He argues that his failure to appear forthcoming can be explained by the Union's failure to prepare him for the hearing.  Admittedly, the length of this preparation meeting is in dispute, as several witnesses claim it lasted around two hours and Minix claims it lasted only twenty to thirty minutes.  But Minix does not dispute the content of the meeting, which covered the relevant evidence on UPS's side.  [Record No. 33-8, p. 193]  He also saw this evidence at the local hearing.  [Record Nos. 33-8, pp. 97–98; 33-11, p. 29]  Additionally, Minix fails to explain why his lack of review of the materials affected his ability to appear forthcoming to the state panelists about what went wrong.

Throughout his response, Minix relies on *Schoonover v. Consolidated Freightways Corp.* to support his position.  147 F.3d 492 (6th Cir. 1998).  There, the Sixth Circuit upheld a jury verdict against the defendants.  The case involved a dispute over a broken piece of equipment, and jurors heard evidence that the union failed to procure "crucial" testimony from an expert witness, failed to investigate similar incidents, relied on the employer's reenactment of the incident, and failed to allow the committee to test the equipment at the hearing.  *Id.* at 496.  The Court held that a jury could rely on "these mistakes" to reach its verdict.  *Id.*

But Minix's case is different from *Schoonover* in a few key areas.  First, Minix has failed to show any mistakes that rise to the level of those committed by the union in

*Schoonover*.  And even if he had shown key mistakes made by the Union, those mistakes must have "tainted the grievance procedure."  *Garrison*, 334 F.3d at 539 (quoting *Dushaw*, 66 F.3d at 132).  In contrast with *Schoonover*, the issues underlying Minix's grievance involve no complicated expert testimony and, for the most part, are undisputed.

In short, Minix cannot prove that Watson gave up on his case before it began.  The state panel hearing was not the only part of the Union's representation.  Minix does not offer evidence refute that Watson worked behind the scenes to achieve a resolution in typical fashion or that he continued to work for his reinstatement after the grievance failed.  Watson rationally decided that convincing UPS that Minix deserved a second chance was the best strategy in the face of undisputed evidence that Minix placed false dispositions on several packages.  In choosing this strategy, the Union did not behave with extreme arbitrariness and thus did not violate its duty of fair representation.

## IV.  ATTORNEY'S FEES

The Union also requests attorney's fees incurred in this action.  "[A] prevailing party may not ordinarily recover attorney fees in the absence of a statute or enforceable contract providing for a fee award."  *Shimman v. Int'l Union of Operating Engr's, Local 18*, 744 F.2d 1226, 1230 (6th Cir. 1974).  An exception to the American rule is only made "in certain exceptional cases where the opposing party has acted in bad faith."  *Id.*

The Union contends that "there is ample evidence that this suit was brought solely as a means to try and embarrass and harass the current administration."  [Record No. 33-1, p. 21]  But in reality, little evidence in the record supports this claim.  While Minix did not prevail here, he took a legally justifiable position throughout this proceeding.  And his arguments

focus on the merits of the Union's representation of him, not on the political tensions within the Union.  The Court requires more than speculation about the behavior and motives of nonparties before awarding attorney's fees.  Accordingly, the Union's request for attorney's fees will be denied.

## V.  CONCLUSION

Being sufficiently advised, it is hereby

**ORDERED** as follows:

1.      Defendant United Parcel Service, Inc.'s motion for summary judgment [Record No. 32] is **GRANTED**.

2.       Defendant International Brotherhood of Teamsters, Local No. 651's motion for summary judgment [Record No. 33] is **GRANTED**.

3.      Defendant International Brotherhood of Teamsters, Local No. 651's motion for attorney's fees [Record No. 33-1] is **DENIED**.

4.      The parties' joint motion to stay the deadlines in the Scheduling Order [Record No. 49] is **DENIED**, as moot.

5.      The jury trial, previously scheduled for May 4, 2021, is **CANCELED** and all other deadlines contained in the Scheduling Order [Record No. 21] are **VACATED**.

Dated: March 22, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky